**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AIDA REYNO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 09 C 4446 |
| | ) |
| PNB REMITTANCE CENTERS, INC., | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Aida Reyno worked as a Branch Manager for Defendant PNB Remittance Centers, Inc. until she was terminated on October 9, 2007, at age 64. In this lawsuit, Reyno contends her termination violated the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* Defendant moves for summary judgment, contending that Reyno was selected for termination as part of a reduction in force and that the decision was based on her comparatively poor job performance, not her age. For the reasons explained below, Defendant's motion is granted.

## FACTS

PNB Remittance Centers, Inc. ("PNB" or "Defendant"), a subsidiary of the Philippine National Bank, describes itself as "a money services business" that provides the Filipino community in the United States with a mechanism for the transfer of monetary funds, referred to as "remittances," from the United States to the Philippines. (Def.'s 56.1 ¶ 1.) As of 2007, Defendant operated 38 branches in 11 states, including four branches in Illinois. (*Id.* ¶ 2.) On June 8, 1999, PNB's then President and Chief Operating Officer, Rommel Garcia, hired Plaintiff, then age 56, to work as Officer in Charge of PNB's branch in Hoffman Estates, Illinois. (*Id.* ¶¶ 3, 16-19.) On February 1, 2000, Garcia promoted Plaintiff to the position of Branch Manager of PNB's office in Niles, Illinois. (*Id.* at ¶ 19.) As Branch Manager, Plaintiff assumed substantial responsibilities,

including preparing and submitting timely reports.[1] (Pl.'s 56.1 ¶ 5.) She understood that certain policy violations—including a failure to follow instructions or policies and procedures, leaving work without permission, and excessive absenteeism—could result in immediate termination. (*Id.* at ¶¶ 14, 15.)

**History of Plaintiff's Declining Performance**

Defendant asserts that Plaintiff's performance started to decline in the years following her promotion and that she received numerous warnings regarding her failure to adequately perform her job duties. (*Id.* at ¶ 20; *see* Exs. 5, 6, 7 to Reyno Dep., Ex. C to Def's Mot. for Summ. J.; Ex. 1 to Garcia Dec., Ex. D to Def.'s Mot. for Summ. J.; Exs. 10, 11 to Alejandrino Dec., Ex. A to Def.'s Mot. for Summ. J.; Ex. 2 to Odulio Dec., Ex. E to Def.'s Mot. for Summ. J.) Though she acknowledges receiving warnings and memos from Defendant dating from 2003 to 2006 (Pl.'s 56.1 ¶¶ 21, 24, 26), Plaintiff rejects their characterization as "numerous." To the contrary, she contends that from 2000-2007 she was told she was "performing well" and at some point during that period received an award for "outstanding performance."[2] (Reyno Dec. ¶ 11, Ex. A to Pl.'s 56.1(b); Pl.'s 56.1 Add'l. ¶ 82.)

Plaintiff admits that PNB's Senior Vice President, Oscar Serafin, sent her a memo on May 29, 2003, in which Serafin noted that Plaintiff had not completed furniture, equipment and fixture inventories for February, March, and April 2003. (Pl.'s 56.1 ¶ 21.) Plaintiff also admits (without

---

[1] According to Defendant, a Branch Manager's duties include overseeing the overall management of a branch, including: (1) engaging in marketing and business development; (2) ensuring adherence to Defendant's policies and procedures and regulatory requirements; (3) ensuring that requirements for physical security and proper maintenance of the premises are met; (4) training branch personnel; (5) cooperating with internal and external auditors and responding to audit findings; (6) monitoring currency transactions; (7) managing the cashier and teller functions; (8) ensuring timely submissions of reports requested by management; (9) checking and responding to e-mail memoranda sent to the Branch; and (10) preparing monthly reports regarding furniture, fixtures, and equipment at the branch. (Def.'s 56.1 ¶ 4.)

[2] The record does not include any specifics regarding the praise or the award.

being specific about the time frame) that she failed to submit these reports "somewhere between once but less than five times a year." (*Id.* at ¶ 22; Reyno Dep. 43.) She admits, further, that Serafin sent her a memo on July 11, 2005, advising her that she had failed to resolve and/or close a number of dormant transactions, despite repeated reminders to do so.[3] (*Id.* at ¶ 24.)

From July 2006 through October 2006, Defendant's Accounting Department sent Plaintiff at least five e-mail messages warning of discrepancies between Plaintiff's holdover log and the general ledger, or reporting that Plaintiff had completely failed to submit a holdover log.[4] (Def.'s 56.1 ¶ 26.) E-mail messages dated August 9, September 18, and October 17, 2006 refer to discrepancies between Plaintiff's holdover balance and Defendant's general ledger in amounts of $1,674.00, $12,400.00 and $12,700.00, respectively. (Ex. 7 Reyno Dep.) Plaintiff admits that she was sometimes more than two days late in submitting her Branch's holdover log. (Pl.'s 56.1 ¶ 26.)

In a memo addressed to Plaintiff dated January 13, 2007, Assistant Vice President and Area Manager Arsenio Odulio reported that he had observed that Plaintiff had not been preparing her branch's Office of Foreign Assets Control ("OFAC") updates[5] and closed and/or dormant account updates.[6] (Def.'s 56.1 ¶¶ 27-28.) Odulio's memo also noted that end-of-day procedures were

---

[3] "Dormant transactions" are transactions in which a customer attempts to remit funds to accounts in the Philippines that are inactive or closed, with the result that Defendant returns the funds to the remitter. (*Id.* at ¶ 23.) The parties agree that Serafin's memo meant that Plaintiff had either failed to refund the remittance to the remitter or that she refunded the remittance but did not properly report it. (Pl.'s 56.1 ¶ 24.)

[4] As part of its normal business practices, Defendant requires its branches to maintain "holdover" logs listing checks that have been submitted to a branch for remittance but not yet cleared for funding by the banking institution. (Pl.'s 56.1 ¶ 25.) While the parties agree there were five e-mails concerning this issue, only three are in the record. (Ex. 7 Reyno Dep.)

[5] These updates were used to monitor whether funds were not being used for terrorist activity. (Def.'s 56.1 ¶ 28, Odulio Dec. ¶ 8.)

[6] With respect to this statement, and several others in Def.'s 56.1, Plaintiff has disputed or denied the statement, but cites no evidence to rebut it. In such circumstances, the court deems the statement admitted. *See* Local Rule 56.1(b)(3)(b).

3

Plaintiff's responsibility and reminded her that they could not be delegated to subordinate employees. (*Id.* ¶ 29.) Odulio stated, in addition, that Plaintiff had not been sending weekly Electronic Remittance Processing System updates and urged her to correct all of the noted deficiencies. (*Id.* ¶ 30.)

The record reflects problems with Plaintiff's attendance, as well. Plaintiff's own subordinate employees complained to Human Resources Manager Alfred "Mike" Alejandrino about Plaintiff's absence from the Branch during business hours.[7] (Def.'s 56.1 ¶ 32, Alejandrino Dec. ¶ 46; Alejandrino Dep. 28.) On February 26, 2007, President Garcia sent Plaintiff a memo warning that if she continued to disappear from her Branch during company time, she would face discipline, which could include termination. (Def.'s 56.1 ¶ 31; Garcia Dec. ¶ 11; Letter from Garcia to Reyno of 2/26/07, Ex. 1 to Garcia Dec.) In addition to President Garcia's memorandum, Plaintiff was counseled by Alejandrino regarding the complaints from her employees on two separate occasions on or about May or June 2007. (Pl.'s 56.1 ¶ 33.) Plaintiff admits she occasionally left the branch during operating hours and, as noted, has acknowledged that her subordinate employees complained about her absences. (*Id.* at ¶ 34.) She explained these absences only by pointing out that her subordinates may not have understood that as Branch Manager she was "exempt" and could leave the Branch to do tasks.[8] (Reyno Dep. 105.) It is undisputed that there were no other written evaluations or periodic reviews of Plaintiff's job performance. (Defendant's Reply to Plaintiff's Local 56.1(b)(3)(B) Statement of Additional Facts ("Def.'s 56.1 Reply Add'l") ¶ 83.)

---

[7] Alejandrino could not say whether the employee complaints were in writing, but he does recall verbal complaints; based upon the timing of the warnings to Plaintiff, the court infers these complaints were voiced in 2007. (Alejandrino Dep. 28.) Plaintiff herself acknowledged that her employees complained, though she believes they voiced their complaints to Serafin, not to Alejandrino. (Reyno Dep. 105; Pl.'s 56.1 ¶ 32.)

[8] President Garcia's memo warned Plaintiff that she could leave the Branch for a personal emergency, provided she notify Serafin or Human Resources Department staff, but that she was not allowed to continue "disappearing" from the Branch on company time. (Garcia letter, Ex. 1 to Garcia Dec.)

**Defendant's Branch Manager Review**

Defendant asserts that sometime in 2006, its net profits began to decrease as a result of the 2005 economic downturn and the increased competition it faced from Western Union and MoneyGram, both of which had expanded their presence in the Philippines.[9] (Def.'s 56.1 ¶¶ 43, 44.) In August 2007, Cely Panganiban, Vice President of Overseas Operations for Philippine National Bank, visited several of Defendant's branches in the United States. (Garcia Dec. ¶ 13.) After the visit, Cely reported to Senior Management that some of Defendant's branches were not being properly managed. (Def.'s 56.1 ¶ 36.) In response, President Garcia instructed Oscar Serafin to hold a Management Committee meeting to address the matter on September 4, 2007. (*Id.* at ¶¶ 36, 37.) Among those present at the meeting were Mike Alejandrino and Senior Vice President and Chief Financial Officer Nelson Javier.[10] (Def.'s 56.1 ¶ 37.) According to Garcia, the committee specifically discussed the performance of PNB's Branch Managers and identified Plaintiff (then age 64), as well as four other managers in California—Ben Manalo (age 63), Thelma Julieta Gueco (age 68), Roberto Navarro (age 63), and Edilberto Vitasa (age 58)—as having the most significant performance problems. (Def.'s 56.1 ¶¶ 37-39; Garcia Dec. ¶ 15; Ex. 12 to Alejandrino Dec.) According to Alejandrino, the committee also discussed Plaintiff's "compliance reporting deficiencies, complaints about her repeated and lengthy absences from the branch during work hours, and [her employees' concerns that she failed] to train new branch employees." (Alejandrino Dec. ¶ 78.) In

---

[9] Plaintiff disputes this information but she does not cite to any evidence in the record to rebut it. Moreover, she acknowledged in her deposition that Defendant was not performing as well as it had in the past and was experiencing financial difficulties. (Reyno Dep. 142-43.)

[10] Plaintiff challenges the credibility of Javier's account of the meeting by pointing out that he was unable to recall any specifics about the meeting. (Pl.'s Mem. at 9.) Defendant notes that although Javier was unable to recall specifics, he did recall general conversations regarding the performance of each branch. (Def.'s 56.1 Reply Add'l. ¶ 95.)

Alejandrino's view, several other Branch Managers also had performance deficiencies, but none had the same history of problems as those of Plaintiff, Manalo, Gueco, Navarro and Vitasa.[12] (*Id.* ¶ 79.)

On the same day that the Management Committee meeting convened, September 4, 2007, Garcia also received a directive from PNB's President Omar Byron T. Mier to "institute a reorganization" of the company to ensure a more efficient use of the company's resources. (Garcia Dec. ¶ 21; Letter from Mier to Garcia of 9/4/07, Ex. 4 to Garcia Dec.) Aware of the reports regarding poor branch management, Garcia determined that the most efficient way to reduce costs was to restructure management positions, which included phasing out the Branch Manager position "through both attrition and a reduction in force."[13] (Garcia Dec. ¶¶ 23-24.) Garcia concluded that the marketing duties performed by Branch Managers could be "more efficiently conducted at the regional and national level[s]," and that the lower-paid Branch Supervisors could absorb the remaining Branch Manager duties. (*Id.* ¶ 25.) As a result, Garcia decided that the five Branch Managers identified as the poorest performers at the Management Committee meeting should be eliminated first as part of the reduction in force. (*Id.* ¶ 26.) Garcia maintains that he was only guided by the directive to cut costs in this regard and never considered the age of any of the individuals he terminated. (*Id.* ¶¶ 28-29.)

**Plaintiff's Termination**

On October 9, 2007, Vice President Odulio met with Plaintiff and sent her a memo stating that her position was being eliminated as result of PNB's reorganization and cost-cutting measures.[12]

---

[12] The record includes copies of disciplinary notices and memoranda written to Manont Manalo, Gueco, Navarro and Vitasa prior to their terminations. (Exs. 13-15, 16 to Alejandrino Dec.)

[13] PNB is continuing to phase out the Branch Manager position as well as employing other cost-cutting measures. (Garcia Dec. ¶¶ 32-33.) For instance, Defendant reduced the amount it paid in health care benefits of its employees' dependents and discontinued providing Branch Managers with incentive bonuses. (Def.'s 56.1. ¶¶ 70-72.)

[12] Defendant contends that after terminating Plaintiff, her branch's overall payroll costs
(continued...)

(Pl.'s 56.1 ¶ 50; Letter from Odulio to Reyno of 10/9/07, Ex. C to Odulio Dec.)  Odulio's letter advised, further, that PNB was invoking the "at-will" provision of Plaintiff's employment and that her termination was effective immediately.[13]  (*Id.*)  Of the two Branch Managers PNB employed in Illinois, only Plaintiff was terminated as part of the reduction in personnel; the other Branch Manager, Christopher Ortiz, age 41, retained his position.  (Pl.'s 56.1 Add'l ¶ 80; PNB RCI Employee Roster at 3, Ex. B to Pl.'s 56.1(b).)  Directly following Plaintiff's termination, Odulio conducted a review of Plaintiff's branch operations and discovered a number of additional performance issues: Plaintiff failed to prepare and/or submit certain required reports for two particular transactions prior to her termination, she had 2,094 unread e-mail messages in her inbox, the branch security videotape was inoperative, and Plaintiff had apparently failed to ensure that a branch employee take the required Bank Secrecy Act/Anti-Money Laundering examination after September 11.[14]  (Odulio Dec. ¶¶ 17-20.)

After Plaintiff was terminated, her duties were divided among several other employees.  (Def.'s 56.1 at ¶¶ 56-58; Plaintiff's Amended Complaint ¶ 10.)  Beginning on October 9, 2007, Senior Customer Relations Assistant Roman Ruyeras, Jr., age 52, temporarily assumed a portion of Plaintiff's duties.  (Def.'s 56.1 ¶ 56.)  Several months later in May 2008, Senior Customer Relations

---

[12](...continued)
decreased from $83,519.69 for the first thirty-nine weeks in 2007, to $75,893.94 during the same period of time in 2008, resulting in a $7,625.75 savings.  (Alejandrino Dec. ¶ 96; Exs. 18, 19 to Alejandrino Dec.)  Indeed, as the court understands the record, Defendant did not hire two new lower-paid workers to replace Plaintiff, but instead assigned Plaintiff's job duties to workers already on staff at a lower rate of pay.  (Def.'s 56.1 ¶¶ 59, 60.)  If this is correct, Defendant's decision to terminate Plaintiff and not hire a replacement would have resulted in a cost savings equivalent to her entire salary, not to an amount net of the income of her replacements.

[13]     Defendant also maintained an employee handbook during Plaintiff's employment that informed employees of their at-will employment status.  (Pl.'s 56.1. ¶ 8-10.)

[14]     According to Odulio, Plaintiff returned to the branch on October 10, 2007 to return a set of keys.  When confronted about the inoperative security recording system (presumably by Odulio), Plaintiff responded that the machine had "been out-of-order for sometime," and that "she informed the head office about it previously."  (Odulio Letter, Ex. 4 to Odulio Dec.)

Assistant, Angeles Recto, age 57, assumed Ruyeras' responsibilities.[15] (*Id.* at ¶ 57; see Ex. 4 to Alejandrino Dec.) Vice President Serafin, then age 70, assumed Plaintiff's former marketing duties until he retired on December 31, 2009. (*Id.* at ¶ 58.) Lastly, Senior Vice President and Chief Operations Officer Manuel Arnaldo, then age 60, assumed Plaintiff's former marketing duties. (*Id.* at ¶ 58.) Plaintiff disputes that Ruyeras, Serafin, Recto, or Arnaldo assumed any of her duties, but she offers no evidence in support that speculation, and acknowledged at her deposition that Ruyeras had assumed a portion of her duties. (Pl.'s 56.1 ¶¶ 56, 58; Reyno Dep. 147.)

**Performance of Other Branch Managers**

Plaintiff asserts that the other four Branch Managers that were terminated during the reduction in force were specifically replaced by younger employees between the ages of 35 to 45-years-old. (Reyno Dep. 150.) Defendant maintains that none of the eliminated Branch Managers, including Plaintiff, have been officially replaced. (Def.'s 56.1 ¶ 56; Alejandrino Dec. ¶ 83.) Plaintiff argues, further, that seven other Branch Managers—ranging in age from 45 to 59—also had performance problems, but were not terminated: Aida de Vega, Aileen Layante, Carmen Hermosisima, Carmenchu Lim, Cecilia Flores, Menchu Bolanos, and Shirley Camacho. (Pl.'s 56.1 Add.'l ¶¶ 88-94.) According to Plaintiff, all seven had "similar performance issues" as Plaintiff, includin, write-ups regarding Daily Operations Log Reports, violations of check writing policies, improper identification of remitters, cancelled dollar transactions, errors in reporting financial transactions, undeclared shortages, and failures to submit end of month reports. (*Id.*) Defendant disputes the factual accuracy of Plaintiff's allegations for each employee and contends that these seven employees' performances issues are not comparable to Plaintiff's "numerous and severe performance problems." (Def.'s Resp. to Pl.'s 56.(b)(3)(B) ¶¶ 88-94.)

---

[15] According to Defendant, Ruyeras earned $1,550 per month and Recto earned $1,700 per month during the times that they assumed Plaintiff's duties. (Def.'s 56.1. ¶ 59.)

Although complete personnel files do not appear in the record, the court notes the following: Adia de Vega, age 59, received a single disciplinary memo in 2000 concerning a violation of Defendant's check cashing policy, and a second one in 2004 concerning untimely logs. Aileen Layante, age 48, received an undated memo referring to her failure to properly identify a "remitter" on three occasions in 2005 and a July 22, 2005 memorandum instructing her to resolve some "cancelled dollar transactions." Carmen Hermosisima, age 45, received a single disciplinary memo in 2007, but other documents show Defendant ultimately concluded she was not at fault for the incident at issue. The personnel file for Carmenchu Lim, age 58, contains a single memo in which Lim attempts to explain the reasons she violated Defendant's "check policies." Cecilia Flores, age 49 received three memos from Defendant: one in 2003 regarding inventory reports; another in 2005 concerning "cancelled dollar transactions" and a third, in 2007, concerning her use of an incorrect receipt code. Menchu Bolanos, age 49, received two disciplinary memos: one in 2003, concerning her failure to submit inventory reports for February, March and April and a second one, in 2004, concerning untimely and incorrect log reports. Shirley Camacho, age 51, received two disciplinary memos, an e-mail and two overage/shortage reports, all relating to incidents in 2004 and 2005. (*See* Employee Roster, Ex. B to Pl.'s 56.1; Personnel File Excerpts, Ex. C to Pl.'s 56.1.) Thus, though Plaintiff is correct that other Branch Managers had performance issues, it appears that Defendant is also correct that none had records of difficulties as lengthy or severe as Plaintiff's.

**Remaining Employee Information**

According to Defendant, PNB employed 61 individuals over the age of 40 on August 31, 2007 (prior to the company's reorganization), but after the reorganization in November 2008, it employed 67 such individuals (presumably due to the aging of its workforce). (Def.'s 56.1 ¶ 61.) As previously noted, Defendant continues to phase out the Branch Manger position, and twenty-seven positions

have been eliminated thus far.[16] (*Id.* ¶¶ 62, 68.) According to Defendant, PNB's remaining Branch Managers have an average age of 52.5, with 27% being over the age of 60. (Def.'s 56.1 ¶ 62.)

**DISCUSSION**

Summary judgment is proper if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Filar v. Bd of Educ. of City of Chicago*, 526 F.3d 1054, 1059 (7th Cir. 2008). The court ordinarily confines its review to "evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Thus, any "conclusory statements, unsupported by the evidence of record, are insufficient to avoid summary judgment." *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *see also Senske v. Sybase, Inc.*, 588 F.3d 501, 504 n.1 (7th Cir. 2009) (finding facts admitted where plaintiff's Rule 56.1 responses are unsupported and insufficient to demonstrate a genuine fact dispute).

**I. Age Discrimination**

The ADEA prohibits employment discrimination against employees over the age of 40. *See* 29 U.S.C. §§ 621, *et seq.* To establish a violation of the ADEA, a plaintiff must demonstrate that she suffered an adverse employment action and that her age was the "but for" cause of the employer's adverse employment decision. *See Gross v. FBL Fin. Servs., Inc.*, ___ U.S. ___, 129 S. Ct. 2343, 2350 (2009). A plaintiff may show discrimination by utilizing either the direct or indirect methods of proof. S*ee Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008). Plaintiff here proceeds under the

---

[16] Plaintiff claims that as of August 31, 2007, PNB employed eight Branch Managers over the age of 59, and of those eight, five were terminated. (Pl.'s 56.1 ¶ 62.) The record in fact shows that as of August 31, 2007, there were six Branch Managers over the age of 59 and that four of them, including Plaintiff, were terminated. (Employee Roster, Ex. B to Pl.'s 56.1.) For instance, 71-year-old Branch Manager named Sinforosa Bustria was not terminated. (Ex. 6 to Alejandrino Dec.)

indirect, burden-shifting approach.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  In a traditional reduction-in-force case—where the plaintiff's position is eliminated entirely—Plaintiff must show that: (1) she was over the age of forty; (2) she performed her job according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees at least ten years younger were treated more favorably by the employer.  *Filar*, 526 F.3d at 1060 (citing *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006)).  In a case such as this, where an employees duties are "spread out among the remaining employees"—sometimes referred to as a "mini-RIF"—a plaintiff need only show that her position was "absorbed" by the remaining younger co-workers.  *Filar*, 526 F.3d at 1060.  In either case, once the plaintiff has presented evidence supporting an inference of discrimination, the defendant may "articulate some legitimate, nondiscriminatory reason for the adverse employment action."  *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 574 (2003) (citing *McDonnell Douglas*, 411 U.S. at 802).  Where the defendant offers such a reason, plaintiff bears the burden "to present some evidence that this reason is pretext for discrimination."  *Filar*, 526 F.3d at 1060 (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000)).

The parties here agree that Plaintiff's duties were not eliminated, but instead absorbed (Pl.'s Compl. ¶ 10; Def.'s 56.1 ¶ 56-68); thus, the court will apply the mini-RIF standard requiring that Plaintiff show her position was absorbed by younger workers.  Defendant also concedes that Plaintiff belongs to a protected class and suffered an adverse employment action when she was terminated.  The parties' central disputes, therefore, are whether Plaintiff performed her job duties according to Defendant's reasonable expectations and whether Plaintiff's duties were absorbed by younger workers.

### A.   Meeting Legitimate Job Expectations

In determining whether an employee met her employer's legitimate job expectations, the court considers the employee's performance at the time of termination.  *Gates v. Caterpillar, Inc.*,

513 F.3d 680, 689 (7th Cir. 2008) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)). Although Plaintiff's testimony may be sufficient to create a dispute of fact on some issues, her own estimation that her work performance was satisfactory may not be sufficient. *See Williams v. Seniff*, 342 F.3d 774, 789-90 (7th Cir. 2003) (explaining that generally "[a]n employee's self-serving statements about [his] ability . . . are insufficient to contradict an employer's negative assessment of that ability"). The undisputed facts show that Plaintiff understood her duties as Branch Manager included preparing and ensuring timely submission of reports; but she failed to submit inventory reports between one and five times a year, failed to provide or properly report remittances, and failed to submit holdover logs to the Accounting Department on time. (*Id.* Pl.'s 56.1 at ¶¶ 22, 24, 26.) Plaintiff also acknowledges that she periodically left her branch during business hours, that her employees complained about such absences, and that Mike Alejandrino confronted her about those complaints. (Pl.'s 56.1 at ¶ 34.)

Plaintiff nevertheless contends there is a genuine dispute of material fact as to whether she was performing her job in accordance with PNB's reasonable expectations. She maintains that she was never warned about her performance before her termination; that she received praise and an award for excellence at some point between 2000 and 2007 during her employment; and that she was not informed that she was terminated for cause, but instead as part of a reduction in force. (Pl.'s Mem. at 7.) Plaintiff contends, further, that Defendant fabricated its allegation that she was not meeting expectations after she filed her charge with the Illinois Department of Human Rights. (*Id.*) Yet Plaintiff herself admits that Alejandrino spoke with her regarding complaints about her absences (Pl.'s 56.1 ¶ 33), and that she violated policies she understood to carry a risk of termination. (Pl.'s Memo P. 7; Pl.'s 56.1 ¶¶ 14, 15, 22, 24, 26, 34.) The court is similarly unpersuaded that Defendant fabricated its allegations of poor job performance in response to an IDHR Report, as Plaintiff has offered no evidence to support such a claim. Assuming that Plaintiff received an award for excellent performance at some undetermined point in time, that fact alone

would not rebut Defendant's contention that her performance was inadequate at the time of her termination. In sum, Plaintiff's inability to show her job performance was adequate "proves to be an insurmountable hurdle for her." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008).

**B.     Absorption of Plaintiff's Duties**

In order to satisfy the fourth prong of a mini-RIF analysis under the *McDonnell Douglas* framework, a plaintiff must show her duties "were absorbed by employees who were not members of the protected class," *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000), that is, substantially younger employees. *See Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997) (considering ten year difference in ages between plaintiff and replacement to be presumptively "substantial.").

Two employees initially absorbed Plaintiff's duties. (Def.'s 56.1 ¶¶ 56, 58.) Ruyeras, 52 years old, initially assumed Plaintiff's branch location duties and Serafin, 70 years old, assumed Plaintiff's former marketing duties. (*Id.*) Recto, 57 years old, succeeded Ruyeras and Arnaldo, 60 years old, succeeded Serafin in assumption of those duties. (*Id.* at ¶¶ 57, 58.) Plaintiff disputes Defendant's assertion that Ruyeras, Recto, Serafin and Arnaldo assumed her duties, but offers no other evidence or citations to the record aside from her blanket denial. (Pl.'s 56.1 ¶¶ 57, 58.) In fact, at her deposition, Plaintiff admitted she had no first-hand knowledge as to who replaced the terminated Branch Managers or the duties the replacements performed, and acknowledged that Ruyeras had in fact assumed her duties. (Reyno Dep. 148-49.) Simply disagreeing with Defendant's asserted facts, without citing to additional support, is not enough to create a dispute of fact. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (citation omitted) (noting that "mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material.").

Plaintiff emphasizes that other than Vice President Serafin, all of the remaining employees who assumed her duties were at least six years younger than she. (Pl.'s Compl. ¶¶ 8-9.) That

13

difference in age does not ordinarily create a presumption of age discrimination, however, and of the four employees who assumed Plaintiff's duties, only Ruyeras was at least ten years younger than Plaintiff. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 659 (7th Cir. 2001) (finding five-year age difference between plaintiff and replacement employee insufficient to set forth *prima facia* case). (Def.'s 56.1 ¶¶ 56, 57, 58.) While Plaintiff may establish a dispute of fact on this issue if she presents other evidence that Defendant thought her age to be significant, *Hartley*, 124 F.3d at 893, she has offered no such evidence, and acknowledges that she did not claim she felt discriminated against at any point during her employment or during the termination meeting. (Pl.'s 56.1 ¶ 51.)

## II.    Pretext

Assuming that Plaintiff's evidence is sufficient to establish a *prima facie* case of age discrimination, Defendant could nevertheless prevail by presenting evidence of a "legitimate, nondiscriminatory reason" for its employment decision. *Germano v. Int'l Profit Ass'n, Inc.*, 544 F.3d 798, 807 (7th Cir. 2008). Plaintiff would then survive summary judgment if she could "show that the proffered explanation is merely a pretext." *Id.* In other words, Plaintiff must show that Defendant's proffered explanation is "a lie, specifically a phony reason" supporting termination. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). Defendant here asserts two legitimate reasons that Plaintiff was terminated: (1) financial difficulties necessitating a reduction in force; and (2) Plaintiff's comparatively poor job performance. While the court finds Plaintiff's *prima facie* showing unconvincing for the reasons explained above, were Plaintiff to survive this hurdle, she would be required to present evidence creating a dispute of fact as to whether Defendant's reasons for terminating her are pretextual. Because the parties have briefed the issues in detail, the court will briefly explain why she cannot meet that burden.[17]

---

[17]      Several of Plaintiff's pretext arguments bear little discussion. Plaintiff urges that PNB's termination of five of its oldest Branch Managers constitutes a statistical pattern, (Pl.'s Mem. at 8), and pretext may in fact be established by "demonstrating that the reduction in force was an
(continued...)

### A. Credibility of Defendant Witnesses

Plaintiff first challenges the credibility of the Defendant's main witnesses: Garcia, Alejandrino, and Javier. (Pl.'s Mem. at 9.) Citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000), she argues that summary judgment is inappropriate because a jury would not be required to accept the testimony of these witnesses. Yet *Reeves* does not establish that any testimony offered by a moving party must be completely disregarded simply because the jury would not have to believe it at a trial. 530 U.S. at 151. To the contrary, the Supreme Court explained that "the court should give credence to . . . 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (quoting 9A CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2529, at 300 (2d ed. 1995)).

Nor is the court persuaded by Plaintiff's contention that Nelson Javier's memory was "conveniently sketchy on all issues regarding performance of bank managers with the exception of the plaintiff" when he testified at his deposition concerning the Management Committee Meeting. (Pl.'s 56.1 Add'l. ¶ 95; Pl.'s Mem. at 9.) Though Javier had trouble remembering specific details from the meeting that occurred years earlier, he did recall discussing in general the declining performance of several of the branches during the meeting. (Javier Dep. 24-38.) The fact that Defendant's witnesses have limited memory is not enough to defeat summary judgment. *See McKinnis v. Brown*,

---

[17](...continued)
excuse to get rid of workers belonging to the protected group." *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1013 (7th Cir. 2000), citing *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1197 (7th Cir. 1997). Any inference that PNB used its reduction in force for this purpose is defeated by the poor performance records of the five Branch Managers it let go, however, and b the fact that a 71-year-old Branch Manager was retained. *See supra* n. 12, 16. Plaintiff is correct that "ageist" remarks made by decision-makers (or those close in rank) may be relevant to a pretext analysis, but Plaintiff offers no evidence of any such comments in this case. Plaintiff is also correct that Defendant may not necessarily escape liability merely because the same person who hired Plaintiff also made the discharge decision, but Defendant has not made the "same actor" argument here.

No. 93 C 6203, 1995 WL 609275, at *4 (N.D. Ill. Oct. 2, 1995) (granting summary judgment when plaintiff failed to present evidence that the witness's statements were untrue).

In addition to her challenge to the credibility of Defendant's witnesses, Plaintiff challenges the credibility of the reasons articulated for her termination. Again, the court is unpersuaded. Both sides agree that Plaintiff had engaged in work rule violations for which termination was a possible result. (Pl.'s 56.1 ¶¶ 14, 15, 22, 24, 26.) This is, thus, not a case similar to the ones she cites, *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999), or *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976 (7th Cir. 2000), where the employer seized on a minor episode to justify its termination decision. Significantly, though Plaintiff had engaged in significant rule violations, Defendant need not establish that her record justified discharge—only that her performance was not as strong as that of the Branch Managers whose positions were not eliminated in August 2007. Plaintiff has not shown that there is a genuine dispute on that issue.

### B.    Evidence of Cost Savings

Plaintiff argues that Defendant's other rationale for her termination—cost savings—is insufficient. Defendant claims that after eliminating Plaintiff's position, "payroll costs" decreased by from $83,519.69 to $75,893.94. (Def.'s 56.1 ¶ 60.) In response, Plaintiff urges that a mere $7,625.75 in cost savings is "classic indicia of pretext," given that PNB is a multi-million dollar company. (Pl.'s Mem. at 10-11.) The court may not, however, second-guess an employer's budget decisions during an economic downtown, or its business judgment generally, as the court must adhere to the well-established principle that "[courts do] not sit as a 'super-personnel department' with plenary authority to review . . . business decisions." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 459 (7th Cir. 1999); *see also Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7 th Cir. 1997) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.")

### C. Shifting Reasons for Termination

Finally, Plaintiff suggests that Defendant has shifted its rationale for the termination decision: in the letter terminating her, Defendant cited a reduction in force, but then later suggested that performance issues supported the decision. (Pl.'s Mem. at 11.) In *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 (7th Cir. 1987) *overruled by Coston v. Plitt Theatres, Inc.*, 860 F.2d 834 (7th Cir. 1988), for example, the court found sufficient evidence for a jury to find the employer's reasons for terminating plaintiffs were "unworthy of credence" where defendant told plaintiff it was closing his division and terminating him for economic reasons, but actually kept the division open and hired a younger replacement. 827 F.2d at 21. "Shifting and inconsistent explanations [may indeed] provide a basis for a finding of pretext," but an employer's reasons "must actually be shifting and inconsistent" to allow for an an inference of untruthfulness. *Schuster*, 327 F.3d at 577 (finding defendant's explanations "substantially consistent with that of a company seeking to reduce costs . . . ."). The court is satisfied that Defendant here has consistently asserted two independent, non-contradictory reasons for its decision: a reduction in force and Plaintiff's poor performance. President Garcia explained that he received an order to reorganize the company due to financial difficulties (Ex. 4 to Garcia Dec.), and also determined that Plaintiff was among the five poorest performing Branch Managers at the Management Committee Meeting on September 4, 2007. (Def.'s 56.1 ¶¶ 36-39.) Because Defendant's rationale is consistent and supported in the evidence, there is no basis here for a finding of pretext.

## CONCLUSION

For the foregoing reasons, Plaintiff cannot make out a *prima facie* case, nor can she show that Defendant's reasons for her discharge were pretextual. Defendant's motion for summary judgment [36] is granted.

ENTER:

Dated: July 22, 2011          _____
                              REBECCA R. PALLMEYER
                              United States District Judge